[No. 11802–1–I.   Division One.   October 7, 1985.]

BETCHARD–CLAYTON, INC., *Appellant,* v. BUD KING,
ET AL, *Respondents,* JEFFREY IVERSON,
ET AL, *Appellants.*

*Eisenhower, Carlson, Newlands, Reha, Henriot & Quinn* and *Richard D. Turner,* for appellants.

*William R. Levinson,* for respondents.

GROSSE, J.—Appellant Betchard–Clayton, Inc., appeals dismissal of its claim for damages under a contract for the sale of a restaurant. Appellants Iverson and Chandler appeal a judgment awarded on a counterclaim wherein the trial court pierced the corporate veil to hold them personally liable.

At the time of this action, Jeff Iverson and Cal Chandler were the sole officers and owners of Betchard–Clayton, Inc. (BC or corporation), whose only business was the ownership and operation of Mulligan's Old Place restaurant at Sea–Tac Mall in Federal Way. The restaurant was offered for sale for $325,000 in 1979. Bob and Jim King, and their father Bud, decided to form a corporation, Dandy Investment Corporation, for the purpose of buying and operating the restaurant. Bob and Jim King were to operate it and their father was to provide the capital.

The "Agreement for Sale" (Agreement) governing the transaction was signed by the BC and Dandy corporations

on December 31, 1979. Bob and Jim King signed in their capacities as officers of Dandy, while Iverson signed in his corporate capacity for BC. Dandy was formally incorporated on January 9, 1980. The Agreement called for a cash purchase price of $250,000 with a specified closing date of February 1, 1980. Bud King, on behalf of Dandy, paid $10,000 to Ram Corporation (another corporation controlled by Iverson and Chandler) at the time of the signing as a portion of the purchase price. The balance was to be paid at closing.

Paragraph 11 of the Agreement governed the closing and set forth specific conditions precedent to the payment of the purchase price including transfer of the liquor license to Dandy and the mall landlord's approval of the assignment of BC's lease to Dandy. These two requirements were not met on February 1, 1980, so the parties agreed to close on the following Friday, February 8. The liquor license was transferred on February 4. The California landlord sent its approval for assignment of the lease February 6 but conditioned that approval on the personal guaranty of the lease by Bud King. The guaranty could have entailed personal liability of up to $180,000 under terms of the lease. On February 8, the Kings refused to close because of the required guaranty. A telephone call to the landlord's attorney disclosed that the guaranty condition could not be resolved on February 8. No new closing date was agreed to. The Kings left the meeting stating that they considered the Agreement terminated.

BC advertised the restaurant for sale again; sued the Kings and Dandy for specific performance on the December 31 Agreement; but changed its pleadings to a claim for damages after the restaurant sold in October 1980. The Kings counterclaimed for the $10,000 down payment which had not been returned. At closing argument on motion of respondents, the trial court added Bud King as third party plaintiff, and added Iverson and Chandler and their marital communities as third party defendants. After argument, the court found BC in breach of the contract, awarded $10,000

to Bud King against BC, Iverson, and Chandler, jointly and severally, and dismissed BC's complaint.

# I
## BREACH OF CONTRACT

Appellants argue that the implied duty of contractual good faith and the express terms of paragraph 11 of the Agreement[1] required Bob and Jim King to have their father execute the personal guaranty or to put over the closing date until the issue was resolved. We agree that there is an implied duty of good faith and fair dealing imposed on the parties to a contract. *Cavell v. Hughes*, 29 Wn. App. 536, 539, 629 P.2d 927 (1981). However, we cannot agree that this duty extends so far as to require a buyer to accept a new obligation which represents a material change in the terms of the contract and which brings in a third party. Nor has any authority been cited to suggest such an extension. Further, since the guaranty could only be signed by the third party, the buyers here had no power to obtain that signature other than by requesting it, which they did. The same reason precludes a finding of breach by Dandy under paragraph 11, which requires the buyer to

---

[1] Paragraph 11 of the Agreement reads in pertinent part:

"11. *Conditions Precedent to Payment of Purchase Price*: Payment of the purchase price shall be conditioned upon the accomplishment of the following conditions precedent, it being understood that *the Seller shall cause such conditions to be accomplished or shall do everything within his power to cause such conditions to be accomplished, whichever may be appropriate.*

" . . .

"(b)(ii) *Approval of Consent to Assignment of Lease*: Seller shall obtain an approval by Landlord for its written consent to an assignment of Seller's interest in the lease . . . *Buyer shall put forth its best efforts to assist Seller in obtaining the approval for written consent of Landlord, including the execution of all documents reasonably necessary to obtain said consent.* In the event that approval of consent to assignment to lease cannot be obtained because of formal matters and not matters of terms, a preliminary approval shall be used and accepted, subject only to the approval of the Washington State Liquor Board and subject to the approval of the Purchasers and their attorney. *In the event that* a satisfactory preliminary approval of consent or *the actual consent to assignment of lease is not received prior to the closing date, the closing date shall be set over to a date and time mutually agreeable and conditioned upon receipt thereof.*" (Italics ours.)

execute all documents reasonably necessary to obtain the landlord's consent, since the guaranty could only have been executed by Bud King and not by Dandy.

Despite appellants' arguments otherwise, there was nothing in the contract itself or implied in law which required the buyers to put over the closing date a second time when faced with no agreement on February 8. The cases cited by appellants stating that a "reasonable time" be given where no time is specified in the contract have no application here: The Agreement states a specific closing date which is only to be set over upon agreement of the parties. That occurred once to put the closing over to February 8. There was no such similar agreement on February 8.

■ We conclude that the contract failed when two conditions precedent were not met: the required guaranty was not resolved on February 8 and no new closing date was agreed upon by the parties. This result accords with *Ross v. Harding*, 64 Wn.2d 231, 391 P.2d 526 (1964), finding the sale of a grocery store void where the necessary condition precedent of consent to the lease by the landlord was not obtained, there being no fault by either party. The court described a condition precedent as a fact or event which

> must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available. . . . Nonperformance or nonoccurrence of a "condition" prevents the promisee from acquiring a right, or deprives him of one, but subjects him to no liability.

(Citations omitted.) *Ross*, at 236. Paragraph 11 of the Agreement designates the landlord's consent to lease as one of the "conditions precedent" to which closing of the transaction was subject. Since the landlord's consent was not obtained except with the material change in terms, there was neither a right to immediate performance nor a breach of contract duty by either party. Under the rule in *Ross*, Dandy was subject to no liability under the contract. The trial court's dismissal of the complaint was proper.

Appellants argue that the Kings are personally bound on

the contract as promoters. This argument is premised on their contention that the corporation never came into existence because its articles as filed contained a forged signature.

■ As a general rule, a promoter is liable on a contract made on behalf of a contemplated corporation, there being a "'strong inference that a person intends to make a present contract with an existing person.'" *Goodman v. Darden, Doman & Stafford Assocs.*, 100 Wn.2d 476, 479, 670 P.2d 648 (1983). However, an exception to the rule provides the promoter is not a party to the contract if the contracting party knew the corporation was not in existence "but nevertheless agreed to look solely to the corporation for performance," the burden being on the promoter to establish such agreement. *Goodman*, at 479; *Heintze Corp. v. Northwest Tech–Manuals, Inc.*, 7 Wn. App. 759, 502 P.2d 486 (1972).

In this case, appellants knew the Dandy corporation was in formation, and the signators for Dandy were two of its officers, the King brothers. Although given an opportunity to challenge the existence of the corporation at trial, appellants declined to do so. The trial court expressly found that Dandy maintained its corporate form at all times and at no time did appellants have a basis for looking toward the individuals for personal liability. Findings of fact 8, 13, 14, 16; conclusion of law 9. There is substantial evidence to support these findings. The exception to promoter liability as stated in *Heintze* (relied upon in conclusion of law 9 by the trial court) and reaffirmed in *Goodman* controls this case.

Even were we to hold that Bud King could be held personally liable on this contract under a theory of promoter liability, such a finding would not change the result. Bud King was under no good faith obligation to consider a material change to the contract, much less be required to agree to one. If any party were to be considered in breach it would be, as the trial court found, BC for proposing the material change. However, since this condition was imposed

by a third party, the landlord, over whom BC had no control, the contract simply failed for want of satisfaction of a condition precedent.

■ The *Ross* court held that the proper remedy was rescission, placing the parties in their precontract status quo. Such a result is appropriate here, though it must be reached by a slightly different route. On the failure of the contract, the $10,000 reverted to Bud King's ownership, but was held by BC which no longer had any right to the property. The imposition of a constructive trust is the appropriate equitable remedy to prevent an unjust enrichment and to return the funds to their rightful owner. *Scymanski v. Dufault*, 80 Wn.2d 77, 88–89, 491 P.2d 1050 (1971).

■ Testimony late in trial revealed for the first time that the business of BC had effectively been terminated after the sale of the restaurant in October 1981 except for the purpose of maintaining the suit. With the corporation reduced to a shell and the down payment funds not available, it is apparent that they had been converted to the use of some other entity or individuals. Any uncertainty as to on whom to impose the constructive trust is short lived.

> Where the [corporate] officer performs an act or a series of acts which would amount to conversion if he acted for himself alone, he is personally liable, even though the acts were performed for the benefit of his principal and without profit to himself personally.

*Dodson v. Economy Equip. Co.*, 188 Wash. 340, 343, 62 P.2d 708 (1936) (reversing the dismissal of the officer and imposing personal liability to the same extent as imposed on the corporation based on the trial court's findings that the corporation converted the property and the officer participated in the conversion). *See also Johnson v. Harrigan–Peach Dev. Co.*, 79 Wn.2d 745, 752–54, 489 P.2d 923 (1971), particularly at page 754, where the court indicates personal liability is appropriate when the officers "exercise such close control, direction and management of the corporation that the law as a matter of elemental justice ought to charge them with knowledge" of the wrong. Although not

the subject of lengthy testimony, it is uncontroverted that Iverson and Chandler were the only owners of, and closely controlled, the BC corporation, making personal responsibility appropriate under the rules of *Johnson* and *Dodson*. A constructive trust for the $10,000 is properly imposed on Iverson and Chandler from the date of the failure of the contract, February 8, 1980, requiring that such amount be returned to Bud King with interest from that date.

## II
### ADDITION OF PARTIES

■ Appellants contend the BC's corporate officers were improperly added as parties after the close of the case and were thus improperly held liable with the corporation for the $10,000 down payment, and that Bud King was improperly added as third party plaintiff for the purpose of receiving judgment. The court may add new parties after the case has closed, in its discretion, where it will not be prejudicial to those parties. *Garvin v. Matthews,* 193 Wash. 152, 158–59, 74 P.2d 990 (1938); *Sidis v. Rosaia,* 170 Wash. 587, 590–92, 17 P.2d 37 (1932). *See also* CR 21[2] and *Carle v. Earth Stove, Inc.,* 35 Wn. App. 904, 907, 670 P.2d 1086 (1983), construing CR 21 under federal precedents permitting addition of parties after judgment had been entered, where no prejudice was shown. In this case, finding of fact 2 is tantamount to a finding that Iverson and Chandler were not prejudiced by their joinder, since they "participated in all proceedings herein and at all times material herein and had notice of all matters from the inception of the negotiation with the Defendants to the conclusion of this trial." Further, our imposition of a constructive trust is but a recognition that the money they received is not theirs and that

---

[2]CR 21 reads in relevant part: "Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." Although neither the parties nor the court referred to CR 21, this appears to be the proper rule for adding a party at this stage of the proceedings, and is consistent with the earlier case law relied on at trial, including that the decision is discretionary with the trial court. *See Shelby v. Keck,* 85 Wn.2d 911, 918, 541 P.2d 365 (1975).

it must be returned. They cannot allege prejudice at having to return that property to its rightful owner.

The trial court and respondents properly relied on *Sidis* for the addition of the corporate officers. That case involved the addition of a party defendant at the close of trial when it became apparent that she had been the driver of the car in the accident rather than her sister, who had been named. The court stated that there was no prejudice since she was in fact the wrongdoer, she took part in the trial and its preparation, and had willfully misled the plaintiff into bringing the action against her sister by giving the sister's name at the scene. *Sidis,* at 590–92. *See also Schroeder v. Hotel Comm'l Co.,* 84 Wash. 685, 694–95, 147 P. 417 (1915). In *Schroeder,* the court affirmed judgment against a third party when the action of his assignee to collect on an installment contract was dismissed and the assigned contract canceled. The third party was ordered to repay the $400 down payment made on the contract. The court held that rather than requiring a new trial the third party and holder of the down payment was the real party in interest, participated in the trial, and was properly held liable.

*Garvin v. Matthews, supra,* explained the application of the exception stated in *Sidis.*

> [T]his liberality in the application of the rule is always predicated on the assumption that the party against whom the ruling is made will not be prejudiced by the amendment or the introduction of a new party.

(Citation omitted.) *Garvin,* at 158–59. The court in *Garvin* went on to permit substitution of a necessary party plaintiff against the named defendant whose liability had been established. *Garvin* supports the addition of Bud King in order to have his $10,000 returned. King was also properly added under CR 17(a), in conjunction with CR 21, providing for the prosecution of actions in the name of the real party in interest since any judgment on the counterclaim was ultimately payable to King. *See Fox v. Sackman,* 22 Wn. App. 707, 591 P.2d 855 (1979), permitting use of CR

17(a) to join the real party in interest after trial for the purpose of receiving judgment.

Both *Sidis* and *Garvin* state strongly the uselessness of forbidding such additions or substitutions of parties where there is no prejudice shown, since a refusal would cause retrial of the same case, delay in final settlement of the issues, and waste judicial resources. *Sidis,* at 590, 592; *Garvin,* at 158–59. Reversing the addition of the third parties defendant and plaintiff here would be equally wasteful in light of the circumstances and lack of prejudice to any party. Iverson's and Chandler's attendance at all aspects of the trial and testimony regarding the location of the funds overcomes any arguments of prejudice they now raise, *Sidis,* particularly since they acknowledged taking the funds on behalf of the corporation. There is no prejudice in being required to return the property of Bud King which they have received. The addition of the third parties defendant was appropriate under both *Sidis* and CR 21.

## III
### JUDICIAL BIAS

Appellants' final contention is that they were prejudiced by having their case tried before a biased judge, a most serious charge. Appellants are primarily concerned with the court's conduct surrounding its distress as to the whereabouts of the $10,000 down payment and its "assistance" to respondents' counsel, including assistance with what turned out to be the basis for joining the corporate officers as individuals.

We have reviewed the entire record carefully and find no indication the trial court was biased against appellants.

We affirm the trial court's judgment.

CORBETT, C.J., and SCHOLFIELD, J., concur.

Reconsideration denied October 7, 1985.

Review denied by Supreme Court November 22, 1985.